# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

**\*\*\***

UNITED STATES OF AMERICA,

               Plaintiff,

vs.

RAUL CASAREZ,

               Defendant.

Case No. 2:15–cr–168–KJD–VCF

**REPORT & RECOMMENDATION**

MOTION TO SUPPRESS (#15)

Mr. Casarez was walking through the curtilage of his home in the daylight when he was stopped by Officer Lewis. Officer Lewis was investigating a non-criminal matter and searching for Joshua Vanname, a white 21-year old with blondish-brown hair and green eyes who was 5'10", 115lbs, and wearing a white shirt and blue pants. Mr. Casarez is a 31-year old Hispanic with black hair, and brown eyes, who weighs 165lbs, who was wearing a white shirt and dark jeans.

Officer Lewis testified that he suspected Mr. Casarez was Mr. Vanname and thought Mr. Casarez was lying about his identity because he did not have identification or know his social-security number. As a result, Officer Lewis told Mr. Casarez to turn around and place his hands behind his back. Mr. Casarez turned, placed one hand behind his back, and ran. A gun fell from his shirt as he fled.

Mr. Casarez was arrested and Mirandized 20 minutes later. He incriminated himself was subsequently indicted for being a felon in possession of a firearm and detained pending trial. He now moves to suppress the incriminating evidence, arguing that he was unlawfully stopped. The court agrees.

A police officer may not stop and interview a person to determine his identity without reasonable suspicion that criminal activity may be afoot. *Terry v. Ohio*, 392 U.S. 1, 30 (1968); *Bekemer v. McCarty*, 468 U.S. 420, 439 (1984). Officer Lewis unreasonably mistook Mr. Casarez for Mr. Vanname, who was

wanted in connection with a non-criminal matter. Therefore, Officer Lewis lacked reasonable suspicion to stop Mr. Casarez because (1) Mr. Casarez bears no resemblance to Mr. Vanname and (2) there was no objective basis to believe that crime may be afoot.

# I. BACKGROUND

On February 25, 2015, the Las Vegas Metropolitan Police Department received a phone call regarding a non-criminal matter from a concerned female. (Mins. Proceedings #26). She wanted her ex-boyfriend, Joshua Vanname, to move out. (*Id.*) No physical violence was reported; but the couple had been fighting. (*Id.*); *see also* (Lewis Rep. (#15-1) at 1).

The caller provided the following description of Mr. Vanname: white, 21-years old, blondish-brown hair, green eyes, between 5'9" and 5'11", and skinny. (Mins. Proceedings #26). She also said that he was wearing a white shirt and blue pants. (*Id.*) She said that she resides at unit 50 in a trailer park located at 4976 Stanley Avenue in Northeast Las Vegas, Nevada. (*Id.*) Mr. Vanname allegedly refused to leave her home. (*Id.*)

Officer Lewis received Mr. Vanname's description from dispatch and responded to the call. (*Id.*) As he drove to 4976 Stanley Avenue, he ran a background check for Mr. Vanname. (*Id.*) It revealed that Mr. Vanname had outstanding warrants for jaywalking and the destruction of property. (*Id.*) It also revealed that the caller's description of Mr. Vanname matched the police department's records. (*Id.*) The background check stated that Mr. Vanname is white, 21-years old with blondish-brown hair, green eyes, 5'10", and weights 115lbs. (*Id.*)

Officer Lewis arrived at 4976 Stanley Avenue at fifteen minutes before noon. (*Id.*) The complex was large; it contains a west end and east end, which are separated by a road and office. (*Id.*) Officer Lewis approached the trailer park's office in his vehicle and immediately saw an individual "briskly" walk away—as if to avoid the police. (*Id.*)

2

After momentarily losing sight of the individual, Officer Lewis made contact with the defendant stating, "Hey, man do you live in the complex here?" (*Id*.) The man stopped. (*Id*.) He was approximately 31-years old, Hispanic, and had black hair, brown eyes, and facial hair. (*Id*.) He was wearing a white shirt and dark jeans. (*Id*.) The man responded to Officer Lewis' question; he pointed and said that he had just come from trailer 7, where he had been staying. (*Id*.)

Officer Lewis suspected the man was Mr. Vanname. (*Id*.) But when Officer Lewis asked for his name, the man said, "Abel Escobar." (*Id*.) Officer Lewis suspected that the man was lying and requested identification. (*Id*.) The man said that he had none on him and asked if he could retrieve identification the trailer. (*Id*.) Officer Lewis said no. (*Id*.)

Based on his training and experience, Officer Lewis believed that he could catch the man in a lie by requesting his social-security number. (*Id*.) If the man knew his social-security number, then he was presumably telling the truth. *See* (*id*.) If he did not know his social-security number, then he was presumably lying. *See* (*id*.) Officer Lewis asked and the man said that he did not know. (*Id*.)

Based on this exchange, Officer Lewis testified that he believed the man was lying and that the man was Mr. Vanname. (*Id*.) Officer Lewis told him to turn around and place his hands behind his back. (*Id*.) The man turned, placed on hand behind his back, and then ran. (*Id*.); *see also* (Lewis Rep. (#15-1) at 1). As he ran, a gun fell from his shirt. (*Id*.)

The man was arrested and Mirandized 20 minutes later. (*Id*.) He incriminated himself and said that his real name is Raul Casarez, a convicted felon. (*Id*.) He was subsequently indicted for being a felon in possession of a firearm and, on June 26, 2015, was detained pending trial. He now moves to suppress evidence of the gun, arguing that Officer Lewis violated the Fourth Amendment by conducting a stop without reasonable suspicion that criminal activity may be afoot or that Mr. Casarez was armed and

presently dangerous. An evidentiary hearing was held on October 16, 2015. This report and recommendation follows.

## II. LEGAL STANDARD

The constitutional principles at play in Mr. Casarez's motion are well established. The Fourth Amendment protects the right of the people to be secure in their persons against unreasonable seizures. U.S. CONST. amend. IV. The touchstone of the Fourth Amendment is objective reasonableness under the totality of the circumstances. *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *Ohio v. Robinette*, 519 U.S. 33, 39 (1996). The Fourth Amendment's emphasis on objective reasonableness under the totality of the circumstances underpins three basic principles that apply here.

First, it is well settled that the police may engage in consensual encounters with a person in public without implicating the Fourth Amendment. *Florida v. Bostick*, 501 U.S. 429, 435 (1991). "[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Id*. "[A]s long as the police do not convey a message that compliance is required," they may approach a person, ask questions, request identification, and obtain consent to search the person or her belongings. *Id*. (citation omitted). The person approached may refuse to listen, decline to answer, and "go about his business." *Id*.; *California v. Hodari D*., 499 U.S. 621, 628 (1991).

Second, the Fourth Amendment is implicated if the police "seize" a person. A person is seized for Fourth Amendment purposes if "a reasonable person would have believed that he was not free to leave." *United States v. McClendon*, 713 F.3d 1211, 1215 (9th Cir. 2013) (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). Additionally, some form of "touching or submission" is also required. *McClendon*, 713 F.3d at 1215 (citing *Hodari D*., 499 U.S. 626–27); *see also United States v. Smith*, 633 F.3d 889, 892–93 (9th Cir. 2011) (finding that a person who did not obey an officer's command to come

4

to the front door had not be seized). "[M]omentary hesitation" without more does not constitute a seizure. *United States v. Hernandez*, 27 F.3d 1403, 1407 (9th Cir. 1994).

Third, in order to lawfully seize a person under the Fourth Amendment, a police officer must at least have reasonable suspicion that "that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous." *Terry*, 392 U.S. at 30; *see also United States v. Cotterman*, 709 F.3d 952, 968 (9th Cir. 2013) (citation omitted) ("Reasonable suspicion is defined as a particularized and objective basis for suspecting the particular person stopped of criminal activity."). Reasonable suspicion is a low standard. It merely requires "some minimal level of objective justification," something more than a "hunch." *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *Terry*, 392 U.S. at 21, 27.

If a police officer violates these principles, the government may not introduce evidence of a crime that is the "fruit" of an unlawful search or seizure. *Wong Sun v. United States*, 371 U.S. 471, 484 (1963). The exclusionary rule is a judge-made rule that penalizes police misconduct. *Spano v. New York*, 360 U.S. 315, 320–21 (1959) ("[T]he police must obey the law while enforcing the law; [] in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves."). It applies to tangible and testimonial evidence. *Murray v. United States*, 487 U.S. 533, 536 (1988).

### III. DISCUSSION

Mr. Casarez's motion presents three questions: whether Mr. Casarez was "seized" within the meaning of the Fourth Amendment and, if so, whether Officer Lewis had reasonable suspicion to believe that Mr. Casarez was Mr. Vanname or that Mr. Casarez was engaged in criminal activity. Each question is addressed below.

**A.**

The first question the court must address is whether Officer Lewis seized Mr. Casarez within the meaning of the Fourth Amendment. The government argues that there was no seizure—and, therefore, no constitutional violation—because the encounter between Officer Lewis and Mr. Casarez was consensual under the U.S. Supreme Court's decision in *Florida v. Bostick* and the Ninth Circuit's decision in *United States v. Washington*. These cases are inapplicable.

In *Bostick*, the Broward County sheriff's department instituted a drug interdiction program. 501 U.S. at 431. Two police officers boarded a bus and requested consent to search Mr. Bostick's bag. *Id*. After consent was obtained, drugs were found and Mr. Bostick was subsequently indicted. *Id*. He later moved to suppress. *Id*. The Florida Supreme Court held that the totality of the circumstances demonstrated that Mr. Bostick was seized because Mr. Bostick was on a bus. The U.S. Supreme Court reversed, stating that "[o]ur cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Id*. at 434. "So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required." *Id*. (citation omitted).

In *United States v. Washington*, the Ninth Circuit identified five factors for lower courts to consider when determining if a person would feel free to "go about his business" under any given set of circumstances. F.3d at 1060, 1063 (9th Cir. 2004). In *Washington*, the Reno Police Department investigated a tip that a person was operating a meth lab in a hotel room. 387 F.3d at 1060. Six armed officers approached the room and asked to speak with the occupant, Mr. Washington. *Id*. at 1068–69. Mr. Washington exited the room, was briefly surrounded by six officers, and was told to leave the door open, despite his request to close it. *Id*. During the course of conversation, an officer learned that Mr.

6

Washington was carrying a concealed weapon and had failed to register. *Id*. at 1064. The officer repeatedly reminded Mr. Washington that this was an arrestable offense. *Id*. at 1069.

One question on appeal was whether, in the absence of an explicit command, a reasonable person would feel free to disregard the police and go about his business under those circumstances. *Id*. at 1068–69. The government contends that *United States v. Washington* applies here and requires the court to decide from the underlying circumstances of Mr. Casarez's situation whether a reasonable person would have felt free to "go about his business." The court disagrees.

*United States v. Washington* applies to cases where the court must deduce from the facts and circumstances how a reasonable person would have felt. Here, Mr. Casarez was explicitly told that he was not free to leave. Officer Lewis testified that he stopped Mr. Casarez because Mr. Casarez resembled Mr. Vanname and because he was "briskly" walking away, as if to avoid police contact. Mr. Casarez similarly testified that that he asked to return to his trailer at the beginning of the encounter, but was not permitted to do so. This constitutes a seizure as a matter of law. *See McClendon*, 713 F.3d at 1215.

The government failed to provide any evidence to the contrary. When asked whether Officer Lewis remembered preventing Mr. Casarez from returning to his trailer, he testified that he did not remember. His failure to remember favors a finding that Mr. Casarez was seized. Officer Lewis testified that he talks to approximately 20 people a day. Encounters with people like Mr. Casarez are routine. A police officer who does not properly memorialize his encounters with suspects risks confusing or forgetting important details. For this reason, officers typically record conversations or document salient facts immediately after they occur. Here, Officer Lewis failed to document whether or not he told Mr. Casarez that he was not free to leave. *See* (Lewis Rep. (#15-1) at 1).

By contrast, Mr. Casarez's description of the encounter was highly credible. There is no doubt that his experience that day was anything but routine. The court finds that Mr. Casarez accurately testified that

Officer Lewis told him that he could not return to his trailer to obtain identification. The court found Officer Lewis' recollection to be less reliable. *See United States v. Mejia*, 69 F.3d 309, 315 (9th Cir. 1995) ("There can be no doubt that seeing a witness testify live assists the finder of fact in evaluating the witness's credibility.").

Nor does the court find, as the government asserts, that the stop was too "momentary" to constitute a seizure under *United States v. Hernandez*. There, a police officer commanded a suspect to "[s]top right there," saying "I need to talk to you." 27 F.3d at 1406. The suspect stopped running away, made direct eye contact with the police officer, attempted to climb over a gate, fell, scuffled with the officer, and escaped. *Id*. at 1405–07. The Ninth Circuit ruled that "[w]e decline to hold these actions sufficient to constituted submission to authority." *Id*. at 1407.

*Hernandez* is incomparable to this matter. Mr. Casarez was stopped and interviewed. When he asked to leave, he was told he was not free to leave. Officer Lewis, then, told him to turn around and place his hands behind his back. Mr. Casarez turned, placed one hand behind his back. Mr. Casarez submitted to Officer Lewis at least twice: (1) he remained with Officer Lewis throughout the duration of an interview that he was not free to leave and (2) he turned around and placed one hand behind his back so Officer Lewis could detain him. This was not a momentary encounter. The court, therefore, concludes that Mr. Casarez was seized for Fourth Amendment purposes.

**B.**

Having determined that a seizure occurred, the court turns to the second question: whether Officer Lewis had an objective basis to suspect that Mr. Casarez was Mr. Vanname. The court finds that Officer Lewis' belief that Mr. Casarez was Mr. Vanname was unreasonable as a matter of law.

In *Terry v. Ohio*, the U.S. Supreme Court held that a police officer may briefly stop a person to investigate a "reasonable suspicion" that "criminal activity may be afoot and that the persons with whom

he is dealing may be armed and presently dangerous." 392 U.S. at 30. In *Bekemer v. McCarty*, the Court expanded the scope of a permissible *Terry* stop from simply conducting a weapons pat down to asking "a person a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." 468 U.S. at 439. The person stopped "is not obliged to respond." *Id*. And, unless the person's "answers provide the officer with probable cause to arrest him, he must then be released." *Id*. at 439–40.

Here, the government contends that the stop was lawful because Officer Lewis reasonably suspected that Mr. Casarez was Mr. Vanname. The court disagrees. Mr. Vanname was described as a white 21-year old with blondish-brown hair and green eyes who was 5'10", 115lbs, and wearing a white shirt and blue pants. By contrast, Mr. Casarez is a 31-year old Hispanic with black hair, brown eyes, and facial hair, who was wearing a white shirt and dark jeans. When Officer Lewis discovered Mr. Casarez, it was daytime. Both descriptions he had of Mr. Vanname matched and came from reliable sources: Mr. Vanname's ex-girlfriend and the Las Vegas Metropolitan Police Department. Under the totality of the circumstances, it was unreasonable to mistake Mr. Casarez for Mr. Vanname.

The government argues that Officer Lewis' mistake was reasonable because Mr. Casarez was located in the same trailer park as Mr. Vanname and Officer Lewis responded to the call within 30-to-40 minutes, when it was likely that Mr. Vanname would still be on the scene. Proximity in time and location to a crime are relevant to determining whether reasonable suspicion exists. *See United States v. Arthur*, 764 F.3d 92, 98 (1st Cir. 2014); *United States v. King*, 990 F.2d 1263 (9th Cir. 1993). "But," as the First Circuit emphasized in *Arthur*, "everything depends on context." *Id*.

In *Arthur*, the First Circuit determined that two officers were entitled to rely on the suspects' proximity in time and location to the alleged crime because additional clues derived from the context also supported the stop. The additional facts included "the precise number of robbers, . . . the direction in which

9

the men were headed, and the dearth of others in the critical two-block area." *Id*. The stop in *Arthur* is unlike the stop in this case. Here, the context and additional facts known to Officer Lewis at the time of the stop should have undermined Officer Lewis' suspicion that Mr. Casarez was Mr. Vanname.

Officer Lewis was called to the scene because Mr. Vanname allegedly refused to leave a trailer home. However, Mr. Casarez was discovered outdoors. Mr. Casarez said that he had just come from trailer 7. However, Officer Lewis had been informed that Mr. Vanname was inside trailer 50. Additionally, Mr. Casarez bears no resemblance to Mr. Vanname's description. Their ethnicities do not a match; their hair color does not match; their eye color does not match; and Mr. Casarez is not "skinny" or 115lbs; he weighs 165lbs. Officer Lewis testified that he disregarded some of these facts because a suspect's weight can change. This was unreasonable. Mr. Vanname's ex-girlfriend had provided a description of Mr. Vanname as "skinny" just 40 minutes earlier.

## C.

Having determined that Officer Lewis lacked an objective basis to suspect that Mr. Casarez was Mr. Vanname, the court turns to the second question: whether Officer Lewis had an objective basis to suspect that crime was afoot or Mr. Casarez was armed and presently dangerous. *See Terry*, 392 U.S. at 24.

The court finds that Officer Lewis lacked an objective basis to suspect that crime was afoot or Mr. Casarez was armed and presently dangerous. Officer Lewis was called to the scene in connection with a non-criminal matter: Mr. Vanname had allegedly refused to leave his ex-girlfriend's trailer and she wanted him to stop trespassing. No crime was reported. When Officer Lewis arrived on the scene, he discovered Mr. Casarez outside and unreasonably mistook him for Mr. Vanname. Because Mr. Casarez was outside, Officer Lewis' mission was moot and the stop was unlawful.

In *United States v. Hensley*, the Supreme Court held that an officer may stop and interview a person if the officer reasonably suspects that the person "was involved in or is wanted in connection with a completed felony." 469 U.S. 221, 229. In *United States v. Grigg*, the Ninth Circuit interpreted *Hensley* and held that an officer may not stop and interview a person if the officer reasonably suspects the person was involved in or is wanted in connection with a completed misdemeanor. 498 F.3d 1070, 1080–81. Here, the government asserts that Officer Lewis lawfully stopped Mr. Casarez in connection with a completed non-criminal matter. This position fails as a matter of law. If a police officer may not stop and interview a person in connection with a completed misdemeanor, *see id.*, then a police officer may not stop and interview a person in connection with a completed non-criminal matter.

Nor does the court find that Officer Lewis had reasonable suspicion that crime was afoot because Mr. Casarez was in a high-crime area and attempted to "briskly" walk away when Officer Lewis appeared. In *Illinois v. Wardlaw*, the U.S. Supreme Court reversed the Illinois Supreme Court, which had held "that flight may simply be an exercise of [a person's] right to 'go on one's way.'" 528 U.S. 119, 123 (citation omitted). The U.S. Supreme Court determined that "unprovoked flight" in a high-crime area supports finding of reasonable suspicion. *Id*. The Court stated: "Headlong flight—where it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Id*. at 124.

However, as applied by the Ninth and Third Circuits, *Illinois v. Wardlaw* is inapplicable because Mr. Casarez was merely walking through the curtilage of his trailer park in the daylight. In *United States v. Kitchen*, the Ninth Circuit determined that an officer does not have reasonable suspicion merely because a suspect walks away from the police in a high-crime area. 11. Fed. Appx. 844, 846 (9th Cir. 2001). In *Kitchen*, two police officers patrolled a high-crime neighborhood and saw two suspects "make hand-to-hand conduct" in a parking lot. *Id*. When the suspects saw the patrol car, they "they turned away from

11

each other, placing their hands in their pockets, and walked away in separate directions" at a normal pace. *Id*. One suspect "looked over his shoulder in the direction of the officers a couple of times." *Id*. The Ninth Circuit reversed the district court and held that the stop was unlawful, stating that the suspect's conduct "inculpates too much innocent behavior." *Id*.

The Third Circuit reached a similar conclusion in *United States v. Navedo*, 649 F.3d 463, 471 (3d Cir. 1012). There, two police officers observed one suspect take a gun from a bag and show it to a second suspect. *Id*. at 466. When the officers exited a nearby patrol car to investigate, the suspects ran. *Id*. The Third Circuit vacated and remanded the district court's holding that the stop was lawful, saying that *Illinois v. Wardlaw* "cannot be used to justify stopping everyone who flees from police" because the "underlying circumstances" control. *Id*. at 471. The Third Circuit cited the facts of *Wardlaw* for support. *Id*. In *Wardlaw*,

> [Officers] Nolan and Harvey were among eight officers in a four-car caravan that was converging on an area known for heavy narcotics trafficking, and the officers anticipated encountering a large number of people in the area, including drug customers and individuals serving as lookouts. *It was in this context* that Officer Nolan decided to investigate Wardlow after observing him flee.

*Navedo*, 649 F.3d at 471 (quoting *Wardlaw*, 528 U.S. at 124) (emphasis added by *Navedo*).

*Kitchen* and *Navedo* are instructive here. Like the suspect in *Kitchen*, Mr. Casarez was merely walking away from a police officer. Similarly, like *Navedo* and unlike *Wardaw*, Mr. Casarez was not confronted by eight law-enforcement officers and a four-car caravan—circumstances that would likely propel a criminal into headlong flight and permit a reasonable police officer to suspect that criminal activity is afoot. Mr. Casarez was merely walking through the curtilage of his trailer park in the daylight. These circumstances are not suggestive of wrongdoing.

12

**D.**

Because Officer Lewis violated the Fourth Amendment, the court must address one final question: whether evidence of Mr. Casarez's gun and incriminating statements should be suppressed from the government's case in chief.

When deciding whether the exclusionary rule should be applied, the question is whether the incriminating evidence was discovered as a result of a police officer's illegal act or "by means sufficiently distinguishable to be purged of the primary taint." *United States v. Davis*, 332 F.3d 1163, 1170–71 (9th Cir. 2003) (quoting *Wong Sun*, 371 U.S. at 488). Evidence is sufficiently purged of the primary taint if (1) there is an independent source for its discovery, (2) it would have inevitably been discovered, or (3) the discovery is sufficiently attenuated from the illegal act. *Davis*, 332 F.3d at 1170–71 (citing *United States v. Smith*, 155 F.3d 1051, 1060 (9th Cir. 1998)).

Additionally, if a police officer obtains a confession after violating the Fourth Amendment, the government must show compliance with the Fifth Amendment and "a sufficient break" between the Fourth Amendment violation and the confession. *Oregon v. Elstad*, 470 U.S. 298, 306 (1985). Courts consider three factors when determining whether an incriminating statement was obtained by exploiting an illegal arrest: (1) the temporal proximity of the statements and the arrest; (2) the presence of any intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975).

The government failed to satisfy its burden of showing that Officer Lewis' illegal act was sufficiently distinguishable from his discovery of the incriminating evidence. But for Officer Lewis' illegal stop, Mr. Casarez would not have fled and dropped the gun. There was no independent source for its discovery; it would not have inevitably been discovered had Mr. Casarez simply gone about his

13

business and returned to his trailer; nor was the discovery of the gun "attenuated from" the illegal stop. Therefore, the gun should be suppressed.

The court reaches the same conclusion with regard to the incriminating statements. Mr. Casarez incriminated himself approximately 20 minutes after the illegal stop. No intervening circumstances occurred. And, the purpose and flagrancy of the official misconduct—(*viz.*, Officer Lewis' unreasonable suspicion that Mr. Casarez was Mr. Vanname and his decision to arrest him for not knowing his social-security number)—is sufficient to warrant suppression. *See United States v. Christian*, 356 F.3d 1103, 1106 (9th Cir. 2004) ("[F]ailure to identify oneself cannot, on its own, justify an arrest").

This conclusion is supported by *United States v. Nora*, 765 F.3d 1049, 1057 (9th Cir. 2014) and *United States v. Shetler*, 665 F.3d 1150, 1158 (9th Cir. 2011). There, the Ninth Circuit suppressed incriminating statements because the statements were obtained "immediately on the heels" of two unlawful searches. *Nora*, 765 F.3d at 1057; *Shetler*, 665 F.3d at 1158. In both cases, the Ninth Circuit held that suppression was warranted because the defendants' statements were "likely influenced by [their] knowledge that the police had already discovered" incriminating evidence. *Nora*, 765 F.3d at 1057.

So too here. When Mr. Casarez incriminated himself, the police had already discovered that he was a felon in possession of a firearm. *See* (Lewis Rep. (#15-1) at 2). A reasonable person would believe that remaining silent would be futile under these circumstances. The government failed to provide any evidence that Mr. Casarez's statements were not the product of the illegal stop. Therefore, his incriminating statements should be suppressed. *See Nora*, 765 F.3d at 1057 (quoting *Shetler*, 665 F.3d at 1158) ("Because the government bore the burden of proving that the defendant's confession was not "fruit of the poisonous tree," the government was required to produce evidence demonstrating that the defendant's answers "were not induced or influenced by the illegal search." The government failed to do so.").

14

### IV. CONCLUSION

Mr. Casarez was walking through the curtilage of his home in the daylight when he was stopped and questioned by Officer Lewis. Officer Lewis was investigating a non-criminal matter and searching for Joshua Vanname—a white 21-year old with blondish-brown hair and green eyes who was 5'10", 115lbs. Mr. Casarez is a 31-year old Hispanic with black hair, and brown eyes, who weighs 165lbs.

Officer Lewis testified that he suspected Mr. Casarez was Mr. Vanname and thought Mr. Casarez was lying about his identity because he did not have identification or know his social-security number. As a result, Officer Lewis told Mr. Casarez to turn around and place his hands behind his back.

This was unreasonable as a matter of law. A police officer may not stop and interview a person to determine his identity without reasonable suspicion that criminal activity may be afoot. *Terry*, 392 U.S. at 30; *Bekemer*, 468 U.S. at 439. This means that "failure to identify oneself cannot, on its own, justify an arrest." *Christian*, 356 F.3d at 1106.

Mr. Casarez bears no resemblance to Mr. Vanname. Mr. Vanname was allegedly indoors and refused to leave, but Mr. Casarez was outdoors. Officer Lewis had not been sent to investigate a crime; and there was no objective basis to suspect that any criminal activity was afoot. Mr. Casarez was merely walking through the curtilage of his home in the middle of the day. Therefore, Officer Lewis lacked reasonable suspicion to stop Mr. Casarez and violated the Fourth Amendment

ACCORDINGLY, and for good cause shown,

IT IS RECOMMENDED that Raul Casarez's Motion to Suppress (#15) be GRANTED.

IT IS FURTHER RECOMMENDED that evidence of Mr. Casarez's gun and incriminating statements be SUPPRESSED from the government's case in chief.

IT IS SO RECOMMENDED.

DATED this 22nd day of October, 2015.


_____

CAM FERENBACH
UNITED STATES MAGISTRATE JUDGE